**Ronald STERN and John Cowan, Appellants,**

v.

**KEI CONSULTANTS, LTD., Appellee.**

**No. 04–03–00098–CV.**

Court of Appeals of Texas, San Antonio.

Oct. 8, 2003.

Michael W. Mengis, Eugene J. Silva, II, Houston, and Keith E. Kaiser, San Antonio, for Appellant.

Ricardo G. Cedillo, David S. Angulo, Les J. Strieber, III, San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice SARAH B. DUNCAN, Justice KAREN ANGELINI, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

Ronald Stern and John Cowan appeal the trial court's order denying their special appearance. We affirm the trial court's order and, in so doing, join the Fort Worth Court of Appeals in holding the fiduciary shield doctrine does not "protect[ ] a corporate officer or employee from the trial court's ... exercise of *specific* jurisdiction as to torts for which the officer or employee may be held individually liable." *SITQ E.U., Inc. v. Reata Rest., Inc.*, 111 S.W.3d 638, 650–51 (Tex.App.-Fort Worth May 22, 2003, pet. filed).

FACTUAL AND PROCEDURAL BACKGROUND

For a number of years, Pasadena Pulp Company, L.P. owned a pulp mill in Pasadena, Texas. To facilitate the discharge of its waste water, Pasadena Pulp entered into a contract with the Gulf Coast Waste Disposal Authority to discharge up to 44 million gallons of waste water per day into the Washburn Tunnel Facility. However, by 1999, Pasadena Pulp had closed its pulp mill, thus significantly decreasing its discharge and significantly increasing the waste water treatment costs not only for it but also for the other Washburn Tunnel Facility participants. Pasadena Pulp offered its excess capacity to the other participants; but each refused. Thereafter, in October 1999, Pasadena Pulp entered into an agreement—the Industrial Waste Water Marketing and Management Agreement—with KEI Consultants, L.P. to market and sell Pasadena Pulp's excess waste water treatment capacity to third parties.

The initial term of the Agreement was from October 13, 1999 until October 1, 2005. However, if KEI failed to reach certain specified performance goals, the Agreement permitted Pasadena Pulp to terminate the agreement earlier. Thus, Pasadena Pulp was contractually permitted to terminate the Agreement before October 1, 2005 if KEI failed to obtain approved contracts to assume 1.5 million gallons per day of Pasadena Pulp's excess waste water treatment capacity within eighteen months. KEI alleges it met this performance goal by obtaining a contract from Valero Refining Company to commit 1.728 million gallons of waste water per

day to the Washburn Tunnel Facility. However, Pasadena Pulp did not approve the Valero contract because, in its view, it required Pasadena Pulp to assume duties and responsibilities beyond those contemplated in the Agreement. After protracted negotiations failed to yield an effective renegotiated agreement, KEI served Pasadena Pulp with written notice of default and, shortly thereafter, filed this suit alleging breach of contract, breach of the duty of good faith and fair dealing, fraudulent concealment, and breach of a confidential relationship against Pasadena Pulp. On the tort claims, KEI also sued John Cowan and Ronald Stern, who participated in the negotiations on Pasadena Pulp's behalf. Cowan and Stern filed a special appearance, which the trial court denied. Cowan and Stern, both citizens and residents of Canada, filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2002).

## BURDEN IN THE TRIAL COURT AND STANDARD OF REVIEW ON APPEAL

■ "The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the long-arm statute." *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002), *cert. denied,* 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003). "But upon filing a special appearance, the nonresident defendant assumes the burden to negate all the bases of personal jurisdiction alleged by the plaintiff." *Id.* "Whether a court has personal jurisdiction over a defendant is a

question of law." *Id.* at 805–06. "But in resolving this question of law, a trial court must frequently resolve questions of fact." *Id.* at 806. "On appeal, the trial court's determination to grant or deny a special appearance is subject to *de novo* review, but appellate courts may be called upon to review the trial court's resolution of a factual dispute." *Id.*

■ "When the trial court does not issue findings of fact, reviewing courts should presume that the trial court resolved all factual disputes in favor of its judgment." *Id.* "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).[3] "For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails." *Id.* A factual sufficiency challenge fails only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *E.g., In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

## APPLICABLE LAW

As to the broad outlines of the applicable law of personal jurisdiction, the parties are in agreement. It is only at the margin that they disagree, as discussed below.

**3.** But what to do when, as here, the trial court does not issue findings of fact or conclusions of law; and the appellate record does not include a reporter's record? Certainly, we imply all findings in support of the judgment. But, in the absence of a reporter's record, are these implied findings conclusively established? On this record, we think not, because the trial court's order states the court

denied the special appearance "[a]fter considering the pleadings on file before the Court, and after hearing the argument and authorities of respective counsel." Because the trial court's order indicates all the evidence before it is included in the clerk's record, a reporter's record is unnecessary to a sufficiency review.

### General Principles

■■ A Texas court may exercise jurisdiction over a nonresident defendant if the exercise of jurisdiction: (1) is authorized by the Texas long-arm statute; and (2) comports with the state and federal constitutional guarantees of due process. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991). Since "[t]he Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow,'" "the Texas long-arm statute requirements are satisfied if exercising jurisdiction comports with federal due process limitations." *American Type Culture*, 83 S.W.3d at 806 (citing and quoting *Guardian Royal*, 815 S.W.2d at 226).

■ Federal due process permits the exercise of jurisdiction over a nonresident defendant if: (1) the defendant has established "minimum contacts" with the forum state; and (2) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *American Type Culture*, 83 S.W.3d at 806 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Sufficient contacts are established if the defendant has "purposefully avail[ed]" himself of the privileges and benefits of conducting business in the forum state. *American Type Culture*, 83 S.W.3d at 806 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ "A defendant's contacts with a forum can give rise to either specific or general jurisdiction." *American Type Culture*, 83 S.W.3d at 806. "For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met: (1) the defendant's contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts." *Id.* "General jurisdiction

..., on the other hand, allows a forum to exercise jurisdiction over a defendant even if the cause of action did not arise from or relate to a defendant's contacts with the forum." *Id.* at 806–07. "General jurisdiction is present when a defendant's contacts with a forum are 'continuous and systematic,' a more demanding minimum-contacts analysis than specific jurisdiction." *Id.* at 807. "Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country." *BMC Software*, 83 S.W.3d at 795.

### "Fiduciary Shield" Doctrine

■ Throughout this proceeding, Stern and Cowan have argued that "Texas law is clear: contacts with the forum state only in the capacity as an officer, director, or representative of a corporation do not create personal jurisdiction over the person. .... For this reason, Stern and Cowan cannot be subjected to either the general or specific jurisdiction of Texas courts." KEI argues, on the other hand, that "the so-called 'fiduciary shield' doctrine is [a] narrow legal principle that applies *only to contract claims* and *only to the exercise of general jurisdiction.*"

■ "[T]he fiduciary-shield doctrine ... holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation...." *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). The doctrine's application by the Texas intermediate appellate courts was extensively reviewed by the Fort Worth Court of Appeals in *Brown v. General Brick Sales Co.*, 39 S.W.3d 291, 298–99

(Tex.App.-Fort Worth 2001, no pet.). Summarizing, the court concluded as follows:

> These cases reveal a certain pattern. First, it appears that the fiduciary shield doctrine has not been explicitly adopted by the Texas Supreme Court. Second, where intermediate appellate courts have applied some aspects of the fiduciary shield doctrine, they have limited its application to jurisdictional claims based on the theory of general jurisdiction as opposed to specific jurisdiction. Third, since Texas courts are to always exercise jurisdiction to the limits of federal due process, we should look to the Supreme Court's analysis in the *Calder*[4] case where that court refused to create a blanket exception to jurisdiction that fails to test each defendant's actions and contacts with the forum separately.

*Id.* at 300. We agree with the Fort Worth Court of Appeals and join it in holding that the fiduciary shield doctrine does not protect "[a] corporate officer or employee ... from the exercise of *specific* jurisdiction as to torts for which the officer or employee may be held individually liable." *SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex.App.-Fort Worth 2003, pet. filed).[5]

### *Fair Play and Substantial Justice*

 "Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, the contacts are evaluated in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice." *Guardian Royal,* 815 S.W.2d at 228. "These factors include (1) 'the burden on

the defendant,' (2) the interests of the forum state in adjudicating the dispute, (3) 'the plaintiff's interest in obtaining convenient and effective relief,' (4) 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (5) 'the shared interest of the several States in furthering fundamental substantive social policies.'" *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "[W]hen an 'international dispute' is involved, the following factors, when appropriate, should also be considered: (a) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; and (b) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies." *Guardian Royal,* 815 S.W.2d at 229. But "when the nonresident defendant has purposefully established minimum contacts with the forum state," "[o]nly in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice." *Id.* at 231. Thus, the burden is on the defendant to " 'present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

### COWAN'S CONTACTS WITH TEXAS

 Cowan argues the trial court erred in denying his special appearance

---

4. *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

5. We do not decide in this case and express no opinion on whether the fiduciary shield doctrine may shield a corporate officer or employee from the exercise of general jurisdiction.

because he did not have the requisite minimum contacts necessary to the assertion of general or specific jurisdiction over him. We disagree.

In its petition, KEI alleges Cowan, a Pasadena Pulp vice president, "admitted to KEI that [Pasadena Pulp] had *always* intended to renegotiate the [Agreement]" and that "such an intention was never discussed with KEI during any of the lengthy negotiations of the Agreement." From these (and other) predicate facts, KEI alleges Cowan "fraudulently concealed from [KEI] the fact that [Pasadena Pulp, Cowan, and Stern] always intended to renegotiate the Agreement and misrepresented their intent throughout this process"; and KEI relied upon Cowan's misrepresentations regarding Pasadena Pulp's intent to perform under the Agreement—rather than to force its renegotiation—to its detriment. "However, the fact that [the defendant] is alleged to have committed a tort in Texas is not dispositive because that, alone, does not give Texas courts jurisdiction over a nonresident. Rather, there must be a substantial connection between the contact and the cause of action in the forum state." *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

In his deposition, Cowan admits he participated in a meeting that he characterizes as "the start of the discussions on how the marketing [of Pasadena Pulp's excess waste water treatment capacity] might be done" in Pasadena, Texas. Between this initial meeting and October 13, 1999, the effective date of the Agreement, Cowan met with a representative of KEI around twenty-five times in Texas. In fact, Cowan considers himself one of the principal negotiators for Pasadena Pulp of the Agreement. Cowan also met five to ten times with other KEI representatives in his office in the Pasadena Pulp offices in Pasadena, Texas. While working at his Pasadena Pulp Office, Cowan stayed in an apartment rented for him by Pasadena Pulp in Houston, Texas. Cowan also participated in the renegotiation of the Agreement and was in fact Pasadena Pulp's primary negotiator. From the end of 1999 through 2001, Cowan attended more than twenty-five meetings in Pasadena, Texas. Cowan also met once or twice with Valero's mill manager or assistant manager at the Valero mill in Pasadena, Texas. Similarly, he received drafts of the Agreement and offered modifications while in Pasadena, Texas. If he received a draft while he was in Vancouver, he delivered his changes or modifications in Texas.

At this stage of the proceeding, this court is not charged with determining the merit of KEI's fraudulent concealment allegations. *See Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 986 (1988). Rather, we must determine whether, in light of KEI's allegations, the evidence establishing that Cowan served as Pasadena Pulp's principal negotiator with KEI, a Texas limited partnership, regarding an agreement that was to have been performed in Texas establishes a substantial connection between Cowan and the State of Texas. We hold that it does. *See, e.g., D.H. Blair Inv. Banking Corp. v. Reardon*, 97 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.) (refusing to apply fiduciary shield doctrine to nonresidents who allegedly "made false representations at meetings in Texas for the purpose of inducing Texas residents to approve ... recapitalization and subsequent IPO"); *Shapolsky*, 56 S.W.3d at 134 ("Where a defendant sends false information into a state, knowing it will be relied upon by a resident of the forum state, there is a foreseeable consequence of direct economic injury to the resident

at its domicile. Therefore, if the alleged tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum, it must reasonably anticipate being haled into court there to answer for its actions.").

### STERN'S CONTACTS WITH TEXAS

■ Stern also argues the trial court erred in denying his special appearance because he did not have the requisite minimum contacts for the trial court to exercise either general or specific jurisdiction over him. We again disagree.

In its petition, KEI alleges that "Cowan and Stern advanced a variety of different excuses and reasons why [Pasadena Pulp] could not execute the Valero Client Contract"; Pasadena Pulp indicated in a July 25, 2001 letter to KEI that "Stern had again changed the deal and now was insisting that KEI put up 35% of the capital required (approximately $805,000) to purchase the KMLT pipeline and that KEI agree to more generous CRC terms than previously agreed." From these (and other) predicate facts, KEI alleges "[Pasadena Pulp], John Cowan, and Ronald Stern fraudulently concealed from [KEI] the fact that they always intended to renegotiate the Agreement and misrepresented their intent throughout this process" and "have consistently breached" their "fiduciary duty to disclose all material facts and at all times act in good faith."

Although Stern has resided in Vancouver, British Columbia since 1969, he and his family (or a family trust) own all of the company that owns a majority interest in and ultimately controls Pasadena Pulp, which has its principal place of business in Pasadena, Texas. Indeed, Stern is the vice-president of the general partner of Pasadena Pulp.

Stern did not participate in the initial contract negotiations directly, although he discussed them with Cowan while he was in Texas. Stern also met with a representative of KEI to "get[ ] an update on how the marketing was proceeding" in Pasadena, Texas. Stern was directly involved in the renegotiations of the Agreement and had a number of discussions about them, either while he was in Texas or with people who were in Texas. Stern signed a letter dated September 7, 2001 and addressed to KEI on Pasadena Pulp letterhead and showing an address in Pasadena, Texas. In this letter, Stern states that he and a representative of KEI "both have invested an inordinate amount of time and energy, in trying to craft a new agreement that would allow us to provide the necessary new services and requirements call[ed] for in the currently unsigned Valero Client Contract"; and "[b]efore concluding that it is just not possible for us to reach a mutually satisfactory new agreement ...., I would like to put forward one last attempt at a compromise." Stern also participated in the discussions leading up to Pasadena Pulp's decision not to execute the Valero contract. Thus, while Stern may not have acted as Pasadena Pulp's principal negotiator in the negotiation of the Agreement, it appears he controlled Pasadena Pulp's efforts to renegotiate the Agreement to KEI's detriment. In light of this evidence, we hold there is a substantial connection between Stern and the State of Texas. *See Reardon*, 97 S.W.3d at 278.

### "FAIR PLAY AND SUBSTANTIAL JUSTICE"

■ As noted above, the second step in our jurisdictional analysis is to determine whether the nonresident defendant has met his burden to "present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Guardian Royal*, 815 S.W.2d at 231 (quoting *Burger King*, 471 U.S. at

477, 105 S.Ct. 2174). Stern and Cowan have not met this burden here.

Stern and Cowan first argue that the mere fact that they are Canadian citizens and residents establishes that "having to defend this suit in Texas represents a significant burden to each of them." The record indicates otherwise. As vice president of Pasadena Pulp's general partner, Stern has traveled to Texas numerous times. Similarly, as president and secretary of Pasadena Pulp, Cowan "travel[s] back and forth between Canada and Texas," and, in particular, traveled to Texas "many, many" times during the last ten years; indeed, he has stayed for six to seven weeks at a time (without returning to Canada) in an apartment maintained for him by one or another of the Texas-based companies for which he has done work. Both men traveled to Texas for their special appearance depositions, during which each was accompanied by an attorney from Vinson & Elkins in Houston, Texas. While in Houston for his deposition, Stern interviewed a prospective employee for Texas Paper Mill, Inc., another corporation with its principal place of business in Pasadena, Texas. Stern or his family trust also ultimately owns the controlling interest in Pasadena Paper Co., Ltd., which owns and operates a paper mill in Pasadena, Texas. And Stern has traveled to Texas on business a dozen or so times before. The record thus establishes that traveling to Texas and engaging the services of a Texas attorney do not pose an obstacle to either man.

Stern and Cowan also argue that "neither ... ever anticipated that their conduct was sufficient to expose them to suit in Texas." We find this assertion difficult to believe. Both men knew full well they were dealing with representatives of a Texas company; they were allegedly attempting to renegotiate a contract to the disadvantage of that Texas company; and the contract was to be performed in Texas by companies operating in Texas. Finally, Stern and Cowan assert "it is fundamentally unfair to allow the exercise of jurisdiction over nonresident foreign citizens who merely participate in contract negotiations on behalf of an employer." In support of their argument, Stern and Cowan cite *Valsangiacomo v. American Juice Import, Inc.*, 35 S.W.3d 201 (Tex.App.-Corpus Christi 2000, no pet.). Stern's and Cowan's reliance on *Valsangiacomo* is misplaced for at least two reasons. First, the defendant in *Valsangiacomo* was a citizen of Spain, not Canada—a country that shares not only the North American continent but a unique relationship with the United States. Even more fundamentally, the *Valsangiacomo* Court expressly held that it "need not examine whether the assertion of personal jurisdiction over [the defendant] would offend traditional notions of fair play and substantial justice," because it had already "concluded [the defendant] established it did not have minimum contacts with Texas." *Id.* at 210.

It is readily apparent that "[t]he State of Texas has a strong interest in the regulation of commercial transactions entered into by its citizens and in providing a forum in which disputes involving its citizens can be resolved." *Shapolsky*, 56 S.W.3d at 135. "This interest in litigation becomes even stronger when, as here, the tort is alleged to have been committed in whole or in part in Texas." *Id.* Certainly, KEI has a strong interest in litigating in Texas, where all of its employees and records are located. In light of the foregoing, we hold the trial court did not err in finding that exercising jurisdiction over Stern and Cowan comports with traditional notions of fair play and substantial justice.

### CONCLUSION

We hold the fiduciary shield doctrine does not insulate a corporate officer or

employee from the trial court's exercise of specific jurisdiction and thus consider the totality of Stern's and Cowan's contacts with the State of Texas as reflected in the record. Having done so, we further hold there is legally and factually sufficient evidence to support the trial court's implied findings that Stern and Cowan had the requisite minimum contacts with the State of Texas during the relevant period of time. We further hold Stern and Cowan have failed to present a "compelling case" that the exercise of specific jurisdiction over them will offend traditional notions of fair play and substantial justice. Accordingly, we affirm the trial court's order denying Stern's and Cowan's special appearance.