NUMBER 13-04-006-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

 

NELSON
B. FREIMER, M.D. AND

VICTOR
I. REUS, M.D.,                                                                  Appellants,

 

                                                             v.

 

DR. MICHAEL ESCAMILLA,                                                   Appellee.

 

      On appeal
from the 139th District Court of Hidalgo County, Texas.

 

 

                               MEMORANDUM
OPINION

 

         Before
Chief Justice Valdez and Justices Hinojosa and Yañez 

                            Memorandum
Opinion by Justice Yañez

 








Appellants, Nelson B. Freimer, M.D., and Victor I.
Reus, M.D., bring this accelerated interlocutory appeal of an order denying
their special appearance.[1]  By a single issue, appellants contend the
trial court erred in denying their special appearance.  We affirm.

                                                                I.  Background

Appellants are research scientists at the University
of California San Francisco (AUCSF@).[2]  Appellee, Dr. Michael Escamilla, is also a
research scientist.  From approximately
1990 through 1998, appellee and appellants conducted research at UCSF on the
genetic origins of psychiatric illnesses. 
In 1998, appellee accepted a tenure-track position at the University of
Texas Health Science Center (AUTHSC@) in San Antonio, Texas.  On November 4, 1998, prior to appellee=s departure from UCSF, appellants and appellee
entered into a collaboration agreement (Athe Agreement@), which provided for collaboration between the
parties on existing and future research. 
Appellee contends that appellants breached the Agreement by failing to
send samples and data to him as called for in the Agreement.  

After resigning from UCSF, appellee sued UCSF[3]
in state court in California (Athe California suit@),
alleging national origin discrimination and retaliation.  The jury found in favor of UCSF.[4]    








On November 1, 2002, appellee sued appellants and
UCSF in Hidalgo County, Texas, alleging breach of the Agreement and related
causes of action.  Appellee alleges that
Texas courts have jurisdiction over appellants because the Agreement was
partially performed in Texas and appellants breached the Agreement.  On December 6, 2002, appellants filed a
special appearance, contending that Texas courts have neither general nor
specific jurisdiction.[5]  Following hearings on March 12, 2003, and
April 24, 2003, the trial court denied appellants=
special appearance on December 10, 2003. 
This appeal ensued. 

II.  Standard of Review 








The plaintiff bears the initial burden of pleading
sufficient allegations to bring a nonresident defendant within the provisions
of the long-arm statute.[6]  To prevail in a special appearance, a
non-resident defendant bears the burden of negating all bases of personal
jurisdiction alleged by the plaintiff.[7]  This standard does not mean that the nonresident
defendant must negate every possible ground in the universe, but rather the
acts in Texas alleged by the appellant to support personal jurisdiction.[8]  Whether a court has personal jurisdiction
over a defendant is a question of law.[9]  In determining the question of personal
jurisdiction, however, a trial court must frequently resolve questions of fact.[10]  Where a trial court enters an order denying a
special appearance and issues findings of fact and conclusions of law, the
appellant may challenge, and the court of appeals may review, the fact findings
on both legal and factual sufficiency grounds.[11]
            

Appellate courts review the trial court=s conclusions of law de novo.[12]  An appellant may not challenge a trial court=s conclusions of law for factual insufficiency;
however, the reviewing court may review the trial court=s legal conclusions drawn from the facts to determine
their correctness.[13]  If the reviewing court determines a
conclusion of law is erroneous, but the trial court rendered the proper
judgment, the erroneous conclusion of law does not require reversal.[14]  We examine the entire record, not just the
evidence in support of the trial court=s legal conclusion.[15]  








When a trial court
does not issue findings of fact and conclusions of law with its special
appearance ruling, all facts necessary to support the judgment and supported by
the evidence are implied.[16]  When the appellate record includes the
reporter's and clerk's records, these implied findings are not conclusive and
may be challenged for legal and factual sufficiency in the appropriate
appellate court.[17]  For legal sufficiency points, if there is
more than a scintilla of evidence to support the finding, the no-evidence
challenge fails.[18]  III.  Applicable Law

In Texas, a party may contest personal jurisdiction
by filing a special appearance.[19]  A special appearance is determined by
reference to the pleadings, any stipulations made by and between the parties,
any affidavits and attachments filed by the parties, discovery, and any oral
testimony.[20]









A Texas court may assert personal jurisdiction over a
nonresident defendant only  (1) when the
Texas long-arm statute authorizes the exercise of jurisdiction and (2) when the
exercise is consistent with the due process guarantees embodied in both the
United States and Texas constitutions.[21]  The long-arm statute authorizes jurisdiction
over a nonresident defendant Adoing business@ in Texas.[22]  The Texas
long-arm statute allows a court to exercise personal jurisdiction over a
nonresident defendant Aas far as the federal constitutional requirements of
due process will allow.@[23] 

Due process permits a state court to exercise
personal jurisdiction over a defendant only if the defendant has some minimum,
purposeful contacts with the state, and the exercise of jurisdiction will not
offend traditional notions of fair play and substantial justice.[24]
A nonresident that purposefully avails itself of the privileges and
benefits of conducting business in Texas is amenable to a suit in Texas.[25]  However, a nonresident will not be subject to
Texas jurisdiction based upon mere random, fortuitous, or attenuated contacts.[26]








The Atouchstone@ of jurisdictional due process analysis is Apurposeful availment.@[27]  AIt is essential in each case that there be some act
by which the defendant 'purposefully avails' itself of the privilege of conducting
activities within the forum State, thus invoking the benefits and protections
of its laws.@[28]  There are
three important aspects to be considered in evaluating purposeful availment.[29]  AFirst, it is only the defendant's contacts with the
forum that count:  purposeful availment >ensures that a defendant will not be haled into a
jurisdiction solely as a result of . . . the unilateral activity of another
party or a third person.=@[30]  Second, the
acts relied upon must be Apurposeful@ rather than Arandom, isolated or fortuitous.@[31]  Third, a
defendant must seek some benefit, advantage, or profit by Aavailing@ itself of the jurisdiction.[32]  By invoking the benefit and protections of a
forum's laws, a nonresident consents to suit there.[33]  By contrast, a nonresident may purposefully
avoid a jurisdiction by structuring its transactions so as neither to profit
from the forum's laws nor be subject to its jurisdiction.[34]








A non-resident defendant=s contacts with a forum can give rise to either
general or specific jurisdiction.[35]  General jurisdiction is established when the
defendant has made continuous and systematic contacts with the forum.[36]  Specific jurisdiction is established if the
defendant's alleged liability arises from or is related to an activity
conducted within the forum.[37]  Thus, for the trial court to have had
specific jurisdiction over appellants, (1) appellants must have purposefully
made minimum contacts with Texas and (2) appellee=s
causes of action must have arisen from or related to those contacts.[38]
   

Upon finding that the nonresident defendant
purposefully established minimum contacts with the forum state sufficient to
support the exercise of either specific or general jurisdiction, we must then
determine if the exercise of in personam jurisdiction comports with fair
play and substantial justice.[39]  In making this determination, we consider (1)
the burden on the nonresident defendant, (2) Texas's interest in adjudicating
the dispute, (3) the plaintiff's interest in getting convenient and effective
relief, (4) the interstate judicial system's interest in obtaining the most
efficient resolution of the controversy, and (5) the states' shared interest in
furthering fundamental substantive social policies.[40]  Only in rare cases will the exercise of
jurisdiction not comport with fair play and substantial justice when the
nonresident defendant has purposefully established minimum contacts with the
forum state.[41]


                                                                   IV.  Analysis

                                                                     A.  Waiver 








We begin by addressing appellee=s argument that appellants waived their right to
challenge the trial court=s jurisdiction by arguing the affirmative defense of
res judicata.  Specifically, appellee
contends that on March 10, 2003, appellants filed a AReply to Plaintiff=s
Response on Defendants= Special Appearance,@ in
which they note appellee=s earlier California lawsuit and state that the
present suit is Anothing more than forum shopping and an effort to
relitigate matters that have already been adjudicated in California.@  At the March
12, 2003 hearing, appellee=s counsel distinguished the California lawsuit,
alleging discrimination and retaliation, from the present suit, alleging breach
of contract.  The court noted that it
wanted to know Aif this matter was pursued in California and to what
degree.@  The court
further noted, AI need to know all the equities and all the facts
and I=m not going to have people litigate the same case
twice.@  

At the April 24, 2003 hearing, appellee argued that
appellants waived their special appearance by arguing res judicata in their
reply.  In response, appellants= counsel noted that ACalifornia
ha[d] a much greater interest in adjudicating this controversy because this
matter has already been litigated over in that state.@  Appellants= counsel further noted that appellants had not Aasked for this court to make any kind of ruling on
an affirmative defense.@  

            We have examined appellants= reply and arguments at both special appearance
hearings.  Appellants did not argue the
affirmative defense of res judicata, request dismissal of the suit on that
basis, or request any other affirmative relief from the trial court.  We conclude appellants did not waive their
right to challenge the trial court=s jurisdiction. 

                                                        B.
Specific Jurisdiction  

It is undisputed that appellants (1) are residents of
California, (2) have never lived or owned property in Texas, and (3) have never
been employed in Texas.   








Appellee contends that appellants are subject to
jurisdiction in Texas because they executed an agreement with a Texas resident,
which provided that part of the Agreement would be performed in Texas.  Appellee contends that this conduct
constitutes doing business in Texas pursuant to section 17.042 of the civil
practice and remedies code.[42]

As noted, the applicable provision of the Texas
long-arm statute defines Adoing business@ as contracting by mail or otherwise with a Texas
resident with performance either in whole or in part in Texas.[43]  It is undisputed that the Agreement was
executed in California.  However, the Agreement
provides for partial performance by the parties in Texas, and appellee contends
that the Agreement was partially performed in Texas. 

The first five paragraphs of the Agreement provide
for the order of authorship of various papers expected to develop from the
parties= research. 
The next section addresses A[f]uture collaboration on bipolar disorders@ regarding Astudies in Costa Rica.@  The Agreement provides, in pertinent part:

Dear Michael:

 

Congratulations on your new position.  As you are leaving the laboratory we need to
make arrangements for your continued participation in the ongoing research
projects of our group.  In structuring
the specifics of the arrangements we are keeping in mind our continuing role in
your career development, our contractual obligations to Millennium
Pharmaceuticals (MPI), and our mutual interest in following usual scientific
practice for collaborations.  This letter
outlines our understanding about these points.

 

. . . . 

 








2.  You will be first author, Alison McInnes (AM)
will be first co-author, and NF [Nelson Freimer] will be last author of a paper
demonstrating a detailed screen of chromosome 18 . . . . The methods of
analysis will be agreed upon by the following authors [you, AM, Sue Service
(SS) and LS].  All genotyping and
analysis for this paper will be performed in NF=s
laboratory.  As with other papers
discussed below, computerized genotype files may be transmitted between NF=s laboratory and your new laboratory, for the
purpose of scoring genotypes.

 

.
. . .

 

5.  In conjunction with Pedro Leon (PL), you will
have the opportunity to write a paper describing the results of genotyping
studies of chromosomes 18p and 18q in a sample of patients from CR [Costa Rica]
pedigrees 001 and 004 with diagnoses other than BPI (the exact diagnoses to be
included will be determined by you, PL, NF [Nelson Freimer], Victor Reus [VIR] and
LS).  The first and last positions on
this paper will be decided between PL and you. 
The diagnostic work for this paper will be carried out under guidance
from LS.  The genotyping for this
analysis will be performed in either the laboratory of PL or you, as decided
between you.  Samples for this analysis
will be provided to you for the purpose of this analysis only.

 

.
. . .

 

7.  You will be an author (unspecified position)
on future genetic mapping and clinical papers that make use of the population
sample collected in CR with your participation.

 

Future
collaboration on bipolar disorder between us will be established as follows:

 

1.  With respect to studies in Costa Rica:

 

a.  You will remain involved in training new
members of the clinical team, for the bipolar disorder projects on which NF is
the PI.  Your involvement in this process
will be coordinated between you and VIR. 
We aim to develop a formal training program for individuals who may be
involved in any of several research projects aimed at identifying the genetic
basis of neuropsychiatric disorders in Costa Rica.  If possible, the training to be conducted by
VIR and you will be within the framework of such a program, and the training
will be uniform for those undertaking diagnostic assessments for all of the
disorders.

 








b.  You and VIR will comprise the nucleus of a
Clinical Studies group to undertake analysis of the clinical database generated
through the genetic studies of bipolar disorder in Costa Rica.  This group may ultimately be expanded to
include other faculty members or trainees at UCSF or University of Texas (UT)
or collaborators from Costa Rica.  The
members of this group will approve individual analyses of the clinical data.  It is our hope that this group will ultimately
analyze clinical data from other disorders under investigation in Costa Rica
(e.g.[,] schizophrenia, substance abuse). 
Furthermore, it is possible that trainees from UT will undertake
analyses under the mentorship of faculty members from UCSF and vice versa.

 

c.  NF and VIR will assist you, as consultants or
collaborators, in your intended efforts to collect a sample of BP patients
within the United States.  We will make
available to you the results of genetic mapping and mutation detection data
from the analyses of BP samples collected in Costa Rica.  As you know, these important data will be
provided to you on a confidential basis as they are obtained.  The intention will be for you to have an
opportunity (in collaboration with NF and VIR) to screen the samples that you
collect for mutations or to search for allelic associations, in advance of
publications (in accord with usual scientific practice, the information
provided will not be used by you for independent presentations, publications or
claims during the period that the information provided remains
confidential).  Additionally, NF and VIR
will discuss with you and your colleagues at UT the possibility of
collaborating in collecting BP samples at different sites in the United States
through a formal funding mechanism (e.g.[,] NIH cooperative ROI proposals).

 

2.  As you request, neither VIR nor NF will
sample probands in Costa Rica identified on the basis of a diagnosis of
schizophrenia.  All samples collected by
you (cell lines and DNA) in your study of schizophrenia in CR, and which are
currently stored at UCSF (the >SC= samples) will be transferred to you at San
Antonio.  Neither VIR nor NF assert any
rights to ownership of such samples nor authorship of papers using those
samples.  From the date of your departure
for San Antonio (November 1, 1998), any additional transformations and DNA
extractions of >SC= samples will be performed on an agreed upon cost
basis.  You will be invited to quarterly
meetings between NF=s group and Millennium Pharmaceuticals (MPI)
relating to the sponsored research agreement between UCSF and MPI that runs
from 1996 to 2000.  Reimbursement for you
to attend these meetings will be at the discretion of MPI upon your request to
MPI.  As you know, meeting participants
must be able to receive confidential information and have no potential or
actual conflicting obligations to third parties.  We agree to provide you with confidential
updates of results from ongoing analyses from our studies of bipolar disorder
in CR.  These updates will occur on an at
least quarterly basis.  In accordance
with scientific practice and in the spirit of collegiality these updates are
for you to continue your collaboration with us and should not be used by you
for independent presentations, publications or claims during the period that
the information provided remains confidential.

 

Sincerely, 

 








/s/ Nelson Freimer, M.D.

/s/ Victor I. Reus, M.D.

 

Please
confirm our understanding by signing below and sending a copy back to me.  I look forward to our continued
collaborations.

 

/s/ Michael A.
Escamilla, M.D                                  Nov.
4, 1998

 

                                         1.  Texas Long-Arm Statute 

 

Appellants contend that
they do not come within the provisions of the Texas long-arm statute because
appellee was not a Texas resident at the time the Agreement was executed.[44]  Although appellants concede that the parties
knew appellee planned to move,  he was a
California resident at the time the parties executed the Agreement.  In support of their argument, appellants cite
Moni Pulo Ltd. v. Trutec Oil & Gas, Inc., 130 S.W.3d 170, 175 (Tex.
App.BHouston [14th Dist.] 2003, pet. denied) (holding
evidence insufficient to support general jurisdiction over non-resident
defendant based on contract between two non-resident defendants where one
defendant=s parent corporation was headquartered in
Houston).  We find Moni Pulo to be
distinguishable from the facts before us. 









In Moni Pulo, the court found insufficient
evidence to support general jurisdiction based on the negotiation of a contract
in Texas by two non-residents for the performance of a joint venture outside of
Texas.[45]   The
Moni Pulo court noted that its decision was based in part on the
rationale that Anegotiating and signing a contract in Texas is
insufficient if performance takes place elsewhere.@[46]  Here,
however, the basis of appellee=s suit is the alleged breach of an Agreement that
provides for partial performance in Texas.

Moreover, Texas courts have generally held that the
relevant jurisdictional time frame ends on the date of the injury.[47]  Because appellee was a Texas resident at the
time the alleged breach occurred, we find appellants= argument to be without merit.  

                                                2.  Partial Performance in Texas

We turn to an examination of the evidence regarding
whether the Agreement was partially performed in Texas.








Dr. Reus testified[48]
that he has had Afrequent communications@ with appellee regarding efforts to complete the
objectives described in the Agreement. 
Dr. Reus said he has Aa stack of e-mails between [appellee] and myself
over a series of projects since November of >98
to the present day.@  According to
Dr. Reus, the activities referenced in the Agreement have continued even after
appellee relocated to UTHSC.  Although
Dr. Reus stated he is Anot interested@ in initiating any new projects with appellee, he
also stated that he Astand[s] fully committed to completing and closing
out the work that we have done together.@  He testified
that there has been a Afruitful working collaboration@ on the projects described in the Agreement.  With regard to paragraph 1a of the Agreement
(training of new members of a clinical team for bipolar disorder projects), Dr.
Reus testified that he had discussed the clinical data set with appellee by
telephone over the last several years and that the project was Ain process.@   

Dr. Freimer testified that he and Dr. Reus are
working to accomplish the objectives described in the Agreement with regard to
appellee.  He stated that he and Dr.Reus
have continued to publish papers with appellee and that Athis has involved a continuous effort over all the
time since he=s [appellee] been gone.@  Dr. Freimer
testified that he has given appellee access to data and to samples.  With regard to paragraph 2 of the Agreement
(concerning the transfer of samples stored at UCSF to appellee), Dr. Freimer
testified that he believes that the transfer has occurred.  

Although appellee contends that many of the
provisions in the Agreement have not been completed, he testified that after
his move to UTHSC, he and Dr. Reus Ahave continued to work on the clinical areas of the
research.@  Appellee
testified that some of the papers described in the first section of the
Agreement have been published.  

Based on the evidence, we conclude that the
Agreement was partially performed in Texas. 
Accordingly, we hold that appellants did business in Texas and that
Texas courts have jurisdiction over appellants under the Texas long-arm
statute.[49]


                                                          3.  Minimum Contacts








We begin our jurisdictional due process analysis by
determining whether appellants  Apurposefully availed@
themselves of the privilege of conducting activities in Texas.[50]  In evaluating purposeful availment, we
examine (1) appellants= contacts with Texas, (2) whether appellants= acts were Apurposeful,@ rather than Arandom, isolated or fortuitous,@ and (3) whether appellants sought some benefit,
advantage or profit by availing themselves of 
the benefits and protections of Texas law.[51]

Appellants argue that executing the Agreement is
insufficient to establish personal jurisdiction over them.  Appellants cite this Court=s opinion in Valsangiacomo v. Americana Juice
Import, Inc., 35 S.W.3d 201, 208 (Tex. App.BCorpus
Christi 2000, no pet.), for the proposition that A[p]artial
performance of a contract in Texas is >not the sine qua non of personal
jurisdiction.=@[52]  Appellants
argue that the Agreement contemplates Aonly incidental activity in Texas@ because Athe only actual defined activity in Texas would be
[appellee] receiving and evaluating the data already collected and compiled in
California and Costa Rica.@ 

The evidence shows that from 1999 through early
2002, appellants corresponded frequently by e-mail with appellee in Texas
regarding their collaboration on various research projects and papers.  As noted above, appellants testified that
they conferred frequently with appellee, sent data and analyses to him, sought
his input regarding the publication of papers, and participated in conference
calls with him regarding various projects.             








Appellants argue that Athe
fact that Texas was the destination for scientific samples is fortuitous and
unrelated to the purpose of the Collaboration Agreement.@  However, the
evidence establishes that appellants sent samples, data, analyses, and
manuscripts to appellee in Texas.  The
evidence shows that appellants actively collaborated with appellee and sought
his input concerning the research and various papers based on the
research.  Dr. Reus described the
relationship as a Afruitful working collaboration@ on the projects described in the Agreement.  

We conclude that appellants acted purposefully by
collaborating with appellee on the research.[53]  By seeking the benefit of appellee=s participation and expertise and the work done at
his UTHSC laboratory, appellants availed themselves of the privilege of
conducting activities within Texas.  We
conclude that appellants have established sufficient minimum contacts with
Texas to subject them to personal jurisdiction.   

Specific jurisdiction exists if the defendant=s activities have been Apurposefully directed@ to
the forum and the litigation results from injuries arising out of or relating
to those activities.[54]  Here, by executing an Agreement requiring
partial performance in Texas, appellants Apurposefully directed@ their
activities to Texas.  Appellants= alleged liability arises from or is related to
their activities in Texas concerning performance of the Agreement.  We conclude that appellee=s claims relate to or arise from appellants= contacts with Texas, such that specific
jurisdiction attaches.  

                        4.  Traditional Notions of Fair Play and
Substantial Justice








Having determined that appellants purposefully
established minimum contacts with Texas to support specific jurisdiction, we
turn to whether the exercise of personal 
jurisdiction over appellants comports with fair play and substantial
justice.[55]

Appellants argue that the burden on them will be Asignificant, given that they are in San Francisco,
California, and must litigate in Edinburg, Texas.@  Unwelcome travel and expenses, however, are
generally insufficient to defeat jurisdiction.[56]  Moreover, UCSF did not contest jurisdiction
and appellants= counsel represented to the trial court that UCSF Amost likely@ will be assuming appellants= defense. 
Therefore, appellants= presence 
will be required in Texas because UCSF has not contested
jurisdiction.  Accordingly, we conclude
that the burden on appellants is not significant.  

For the same reasons, we find that the interstate
judicial system=s interest in obtaining the most efficient
resolution of the controversy weighs in favor of finding that the exercise of
jurisdiction over appellants is proper. 
We also find that Texas has a significant  interest in adjudicating the dispute.[57]  The record includes the affidavit of Charles
L. Bowden, M..D., chair of the psychiatry department at UTHSC.  The affidavit states that UTHSC has
contributed approximately $300,000.00 to provide equipment to appellee to carry
out the research described in the Agreement and that the alleged breach of the
Agreement will Ahave a major impact on the research mission@ of the department.








Taking into account all the factors involved in a
fairness analysis, we hold that the exercise of jurisdiction over appellants by
a Texas court does not offend traditional notions of fair play and substantial
justice.[58]  Accordingly, we AFFIRM the trial court=s denial of appellants=
special appearance.    

 

                                                              
                                                        

LINDA REYNA YAÑEZ,

Justice

 

 

 

 

Memorandum
opinion delivered and filed 

this
the 16th day of March, 2006.

 











[1]
See Tex. Civ.
Prac. & Rem. Code Ann. ' 51.014 (a)(7) (Vernon Supp. 2005); Tex. R. App. P. 28.1. 





[2]
By December 2002, Dr. Freimer
was a professor at the University of California Los Angeles.   





[3]
Although Dr. Freimer was
initially a defendant in the suit, the trial court granted summary judgment on
the cause of action involving him and dismissed him from the suit.





[4]
See Escamilla v. Regents
of the Univ. of California, et al., 2003 WL 22930594 (Cal. App. 1 Dist. 2003, review
denied). 





[5]
The regents of UCSF did not
contest jurisdiction.  At the April 24,
2004 special appearance hearing, UCSF=s counsel advised the trial court that UCSF Amost likely@ was assuming the defense of
appellants.  





[6]
Am. Type Culture Collection,
Inc. v. Coleman, 83
S.W.3d 801, 806 (Tex. 2002); BMC Software Belg., N.V. v. Marchand, 83
S.W.3d 789, 793 (Tex. 2002).  





[7]
Coleman, 83 S.W.3d at 806; BMC Software,
83 S.W.3d at 793.





[8]
Walker Ins. Servs. v.
Bottle Rock Power Corp., 108 S.W.3d 538, 548 (Tex. App.BHouston [14th Dist.] 2003, no pet.).  





[9]
Coleman, 83 S.W.3d at 805-06; BMC Software,
83 S.W.3d at 794. 





[10]
BMC Software, 83 S.W.3d at 794.





[11]
Id.





[12] Id.





[13] Id.





[14]
Id.





[15]
Valsangiacomo v. Americana
Juice Import, 35
S.W.3d 201, 205 (Tex. App.BCorpus Christi 2000, pet. dism=d w.o.j.).  





[16]
BMC Software, 83 S.W.3d at 795. 





[17]
Id.  





[18] Id. 






[19]
Tex.
R. Civ. P. 120a(1).





[20] Id. at
120a(3).





[21] Coleman, 83
S.W.3d at 806. 





[22] See Tex. Civ. Prac. & Rem. Code Ann. ' 17.042 (Vernon 1997). In pertinent
part, the Texas Civil Practice and Remedies Code characterizes nonresident
activity as "doing business" in Texas where the nonresident:

  (1) contracts by mail or otherwise
with a Texas resident and either party is to perform the contract in whole or
in part in this state; 

  (2) commits a tort in whole or in
part in this state; 

 (3) recruits Texas residents,
directly or through an intermediary located in this state, for employment
inside or outside this state; or 

  (4) performs any other acts that
may constitute doing business. 

 

Tex. Civ. Prac. & Rem. Code Ann. ' 17.042 (Vernon 1997).





[23] Coleman, 83
S.W.3d at 806.





[24]
Id. 





[25]
Id. 





[26]
Id.





[27]
Michiana Easy Livin'
Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005) (citing Hanson v. Denckla, 357
U.S. 235, 253 (1958)).





[28] Id.





[29]
Id. at 785. 





[30]
Id. (quoting Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 475 (1985)). 





[31]
Id. (quoting Keeton v. Hustler
Magazine Inc., 465 U.S. 770, 774 (1984)).





[32]
Id. (citing Merriam Webster=s
Collegiate Dictionary 79
(10th ed. 1993) (AAvail: . . . to be of use or
advantage to: profit@)).





[33]
Id. (citing World‑Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).





[34]
 Id. (citing Burger King, 471
U.S. at 473).





[35]
Commonwealth Gen. Corp. v.
York, 177 S.W.3d
923, 925 (Tex. 2005).   





[36]
Id.  





[37]
Id.





[38]
See id.





[39]
Guardian Royal Exch.
Assur., Ltd. v. English China Clays P.L.C., et al., 815 S.W.2d 223, 228 (Tex. 1991). 





[40]
Id.





[41]
Id. at 231.  

 





[42]
See Tex. Civ.
Prac. & Rem. Code Ann. ' 17.042 (Vernon 1997).





[43]
Id. at ' 17.042 (1).





[44]
Appellants dispute that the
Agreement is an enforceable contract; however, for purposes of  special appearance analysis, they assume it
to be an enforceable contract.  See
Stern v. KEI Consultants, Ltd., 123 S.W.3d 482, 489 (Tex. App.BSan Antonio 2003, no pet.) (noting
at special appearance stage of proceedings, reviewing court is not charged with
determining merits of underlying claims). 






[45]
Moni Pulo Ltd. v. Trutec
Oil and Gas, Inc.,
130 S.W.3d 170, 175 (Tex. App.BHouston [14th Dist.] 2003, pet. denied) Id. at
175-76.





[46]
Id. at 175. 





[47]
Schott Glas v. Adame, 178 S.W.3d 307, 313 (Tex. App.BHouston [14th Dist.] 2005, pet.
filed) (citing cases).  





[48]
In support of their special
appearance, appellants submitted the affidavit of Paul G. Gutierrez, chief
trial counsel for appellants and UCSF in the California suit.  Attached to Gutierrez=s affidavit were excerpts of
testimony from the California suit. 
Unless otherwise noted, all references to Atestimony@ in this opinion refer to testimony
given by the parties in the California suit. 






[49]
See Tex. Civ.
Prac. & Rem. Code Ann. ' 17.042(1) (Vernon 1997).





[50]
See Michiana, 168 S.W.3d at 784-85.





[51]
Id. at 785.





[52]
Valsangiacomo., 35 S.W.3d at 208 (quoting Magnolia
Gas Co. v. Knight Equip. & Mfg.Corp., 994 S.W.2d 684, 692 (Tex. App.BSan Antonio 1998, no pet.), rev=d on other grounds by BMC Software, 83 S.W.3d at 794).   





[53]
See Michiana, 168 S.W.3d at 785.





[54]
Commonwealth, 177 S.W.3d at 925. 





[55] Guardian Royal, 815 S.W.2d at 228.





[56]
Id. at 231.





[57]
Id. at 228.





[58]
See id. at 234.