**Opinion issued November 21, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00956-CV

————————————

**STEAMBOAT CAPITAL MANAGEMENT, LLC
AND JAY A. JOHNSTON, Appellants**

**V.**

**R.K. LOWRY, JR., L-FALLING CREEK LLC, RUSSELL A. CHABAUD, R-RAC WIMBLEDON, LLC, JOHN P. MOFFITT, J-JASON LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE RUSSELL G. CHABAUD 1999 INVESTMENT TRUST, R- RUSSELL WIMBLEDON, LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE ASHLEY CHABAUD 1999 INVESTMENT TRUST, R-ASHLEY WIMBLEDON, LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE AUDREY CHABAUD 1999 INVESTMENT TRUST, R-AUDREY WIMBLEDON, LLC, LMC RECOVERY FUND, LLC, UNION GAS FUNDING I, L.P., RANA HOLDINGS, LLC, WESTY I LLC, AND MOGI, LLC, Appellees**

On Appeal from the 80th District Court
Harris County, Texas
Trial Court Case No. 2008-74262

## MEMORANDUM OPINION

Appellees, R.K. Lowry, Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John P. Moffitt, J-Jason LLC, Russell A. Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon, LLC, Russell A. Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell A. Chabaud, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, LMC Recovery Fund, LLC, Union Gas Funding I, L.P., Rana Holdings, LLC, Westy I LLC, and Mogi, LLC, sued numerous defendants,[1] including appellants, Jay A. Johnston ("Johnston") and Steamboat Capital Management, LLC ("Steamboat"), for breach of fiduciary duty, negligence, fraud, conspiracy, and, in the alternative, breach of contract, complaining of tax-reducing investment strategies, involving both foreign distressed debt and digital options contracts on foreign currency, that they alleged were marketed to them through a scheme to defraud them out of millions of dollars in fees and that resulted in severe penalties being imposed against them by the Internal Revenue Service ("IRS").

---

[1]  BDO Seidman, L.L.P., Randy L. Moorman, Robert Greisman, Paul Shanbrom, Lawrence Cohen, Sidley Austin, LLP f/k/a Sidley Austin Brown & Wood, LLP f/k/a Brown & Wood LLP, Raymond J. Ruble, De Castro, West, Chowdoro, Glickfeld & Nass, Inc., Gramercy Advisors, LLC, Gramercy Asset Management, LLC, Gramercy Local Markets Recovery Fund, LLC, Gramercy Financial Services, LLC, Steamboat Capital Management LLC, Jay A. Johnston, Marc Helie, Financial Strategy Group PLC, and Morgen, Lewis & Brockius, LLP.

In two issues in this interlocutory appeal,[2] Johnston and Steamboat challenge the trial court's orders denying their special appearances. We affirm the trial court's order denying Johnston's special appearance. We reverse the trial court's order denying Steamboat's special appearance and render judgment granting the special appearance and dismissing the claims against Steamboat.

**Background[3]**

Among their claims in their fifth amended petition, appellees alleged that a group of defendants, the "Strategy Defendants," which was comprised of Gramercy Advisors, LLC and various forms,[4] Johnston (a Gramercy principal), and Steamboat (a "Gramercy-related entity") (collectively referred to in the petition as "Gramercy"), along with other defendants not parties to this appeal,[5] acted "jointly and in concert" to develop, promote, sell, and implement certain investment

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2016).

[3] Only those facts pertinent to this appeal and relevant to the context are stated. This is our third occasion to address the trial court's special appearance rulings in this suit. *See Gramercy Advisors LLC v. R.K. Lowry, Jr.*, No. 01-14-00904-CV, 2015 WL 3981610, at *15 (Tex. App.—Houston [1st Dist.] June 30, 2015, no pet.) (mem. op.) (affirming trial court's order denying special appearance of Gramercy); *Fin. Strategy Grp., PLC v. R.K. Lowry, Jr.*, No. 01-14-00273-CV, 2015 WL 452265, at *12 (Tex. App.—Houston [1st Dist.] Jan. 27, 2015, no pet.) (mem. op.) (reversing trial court's order denying special appearance of Financial Strategy Group, PLC).

[4] Gramercy Asset Management, LLC, Gramercy Local Markets Recovery Fund, LLC, and Gramercy Financial Services, LLC.

[5] Other "Strategy Defendants" include BDO Seidman LLP; Sidley Austin, LLP; De Castro, West, Chodorow, Glickfelf & Nass, LLC; and Financial Strategy Group PLC.

3

strategies as a part of a conspiracy to commit fraud.  Appellees alleged that the "Strategy Defendants" represented that they had designed proprietary tax-advantaged investment plans that would provide substantial returns on investments and minimize tax obligations.  Appellees asserted that the Strategy Defendants knew, or should have known, that the investment strategies would not, and could not, yield the tax advantages claimed and knew that federal authorities were investigating the legality of similar "abusive tax shelters."  Appellees alleged that the defendants did not disclose the investigation in order to "extract millions of dollars in fees and commissions" from them.  And, after appellees, relying on the Strategy Defendants' representations, entered into the investment strategies and claimed certain losses on their year 2000 to 2005 tax returns, the IRS subjected them to costly audits and substantial penalties, interest, and back-taxes.

Specifically, appellees alleged that Gramercy, along with BDO Seidman LLP ("BDO"),[6] sold them the investment strategies at issue.  In September 2000, BDO representatives, Randy Moorman and Paul Shanbrom,[7] requested a meeting with appellees Lowry and Chabaud, along with their accountant, Newt Vannaman,[8] to educate them on BDO's expertise and services.  After Lowry and Chabaud signed

---

[6]     BDO is a defendant in the trial court, but is not a party to this appeal.

[7]     Moorman and Shanbrom are defendants, but are not parties to this appeal.

[8]     Not a party to this appeal.

4

non-disclosure agreements, BDO told them that it had developed several investment strategies to meet their financial, investment, and tax needs. BDO described the strategies as having "significant tax benefits because they took advantage of certain loopholes contained in the [tax] code with respect to partnerships," that were "completely legal and valid."

One such investment strategy involved foreign distressed debt.[9] Shanbrom told Lowry and Chabaud that they could invest in foreign distressed debt, and, after executing the proprietary strategy, could legally take a loss on the debt through the application of certain partnership tax rules. Shanbrom and Moorman reassured Lowry and Chabaud that "all of the big accounting firms were implementing similar types of tax-advantaged investment strategies." Shanbrom asserted that he had personally implemented the strategy and provided information regarding other BDO clients that had implemented the strategy. Shanbrom emphasized that Gramercy had expertise and a "reputation as a leader" in providing clients with distressed-debt investments, and he recommended that Lowry and Chabaud engage Gramercy to assist BDO in the implementation of the strategy. Shanbrom also encouraged Lowry and Chabaud to invest an additional $15,000,000.00 with Gramercy in unrelated investments, which would diversify their portfolios. According to Shanbrom, these

---

[9] Distressed-debt instruments are those that can be purchased at a significant discount from the face value, such that they have a significant built-in loss through their high basis, but low value. *Fin. Strategy Grp., PLC*, 2015 WL 452265, at *3 n.3.

unrelated investments would strengthen Lowry's and Chabaud's "position[s]" in the event that the IRS audited their returns. After the meeting, Shanbrom and Moorman advised Lowry and Chabaud that if they wished to implement the distressed-debt strategy for the 2000 tax year, they should make investments with Gramercy by November 2000.

On November 7, 2000, appellees Lowry, Chabaud, and Moffit, along with their accountant, Vannaman, attended a meeting in Houston with Shanbrom and Moorman, of BDO, and Johnston, a principal at Gramercy. According to appellees, Shanbrom and Johnston discussed the steps of the distressed-debt strategy and reiterated that it was a "completely legal tax-reducing strategy." Shanbrom emphasized that BDO felt so confident about the strategy that it would represent appellees in any IRS audit. Shanbrom and Johnston further told appellees that R.J. Ruble,[10] who was "the recognized expert with respect to distressed-debt strategies" and a partner in the law firm of Sidley Austin, LLP,[11] would issue an independent opinion letter, confirming the propriety of the distressed-debt strategy. Shanbrom and Johnston advised appellees that the independent nature of the opinion letters would "provide the required legal support to confirm the propriety of the strategy and overcome any IRS challenge and, equally as important, would provide absolute

---

[10]     Not a party to this appeal.

[11]     Not a party to this appeal.

penalty protection." Shanbrom and Johnston recommended that appellees undertake a distressed-debt strategy to be implemented over a five-year period, beginning with tax year 2000, and represented that BDO and Gramercy would handle the design and implementation of the distressed-debt strategy.

Appellees further alleged that, pursuant to BDO and Gramercy's advice and instructions, they executed a consulting agreement with BDO and investment management agreements with Gramercy. Appellees asserted that, unbeknown to them, BDO and Gramercy had an independent agreement to share in the fees generated from appellees.

Appellees asserted that, in 1999 and 2000, almost a full year before BDO and Gramercy recommended the investment strategies at issue, the IRS had issued general notices to taxpayers, stating that these types of investment strategies constituted illegal and abusive tax shelters. Appellees alleged that the Strategy Defendants were aware of these notices and not only did not disclose the information to appellees, but told them the opposite.

In 2000, Gramercy, BDO, and Sidley Austin, acting pursuant to an undisclosed arrangement with Lehman Brothers Commercial Corporation, planned and executed a tax strategy involving the purchase and sale of digital options on foreign currency (the "2000 Digital Options Strategy"). They advised several appellees, including Lowry, Chabaud, and Moffit, to make certain investments that

7

would "substantially reduce or eliminate" their tax liabilities, and they assured appellees that the strategy was legitimate and in accordance with all applicable tax laws, rules, regulations, published court decisions, and common law doctrines. They told appellees that Sidley Austin would issue an independent opinion letter that would enable them to satisfy IRS auditors as to the propriety of the tax returns. Appellees asserted that the Sidley Austin letters, which did not mention the IRS notices, represented "canned" opinion letters that had no actual basis in law. In reliance on the representations, appellees engaged in the strategy and then claimed long-term capital losses on their year 2000 federal tax returns.

Subsequently, pursuant to collective advice from the Strategy Defendants, appellees formed the LMC Recovery Fund, LLC ("LMC Fund") and entered into the "2001 Distressed-Debt Strategy." Appellees made certain capital contributions into the LMC Fund. Specifically, the Gramercy Local Markets Recovery Fund, LLC, along with certain Brazilian and Bulgarian companies, contributed distressed-debt instruments to the LMC Fund. Appellees then purchased additional interests in the LMC Fund, and the LMC Fund then sold a portion of the distressed debt, generating losses. Appellees then claimed these losses on their 2001 federal tax returns. Again, Sidley Austin provided appellees with an opinion letter advising that the transactions were legal. And, BDO prepared a 2001 federal tax return for

8

the LMC Fund and provided appellees with copies of the return. In 2002, appellees engaged in a similar investment strategy.

In the "2003 Distressed-Debt Strategy," Lojas Arapua S.A. ("Lojas"), a Brazilian company, contributed certain distressed-debt instruments to MPATRN, LLC, a Delaware limited liability company. MPATRN then contributed distressed-debt instruments to the LMC Fund, in exchange for a membership interest. Appellees then purchased additional interests in the LMC Fund, and the LMC Fund sold a portion of the distressed debt, generating losses. Again, the Strategy Defendants advised appellees that they could properly claim the losses on their 2003 federal tax returns, and they did so. In January 2004, law firm De Castro[12] issued opinion letters to appellees, characterizing the losses realized as "ordinary," stating that there was a "greater than 50 percent likelihood" that the tax treatment would be upheld if challenged by the IRS, and asserting that the investors "would not be subject to" certain penalties by the IRS. Appellees asserted that the Strategy Defendants were aware, and intentionally failed to disclose, that the IRS, based on applicable statutes, regulations, and established and controlling case law, "would conclude that the 2003 Distressed-Debt Strategy" was an illegal and abusive tax shelter. Moreover, the Strategy Defendants affirmatively advised appellees to the contrary. Appellees asserted that they lost a "significant amount of money in

---

[12] Not a party to this appeal.

9

carrying out the 2003 Distressed-Debt Strategy"; they paid "significant fees to the 2003 Strategy Defendants"; and they were assessed substantial back taxes, interest, and penalties as a result of their participation in the 2003 Distressed-Debt Strategy. Appellees engaged in similar investment strategies again in 2004 and 2005.

Subsequently, appellees received from the IRS certain "Notice[s] of Audit," pertaining to their 2001 through 2005 tax returns, and, ultimately, the IRS imposed on them penalties, interest, and back taxes.

Appellees asserted that, in each of the investment strategies, the Strategy Defendants and "other participants" conspired with one another to design, promote, sell, and implement the strategies for the purpose of receiving and dividing substantial fees collected from appellees.

In their breach-of-fiduciary-duty claim, appellees alleged that the Strategy Defendants, as their accountants, financial and investment advisors, and attorneys, owed appellees a duty of honesty and care. Appellees asserted that the Strategy Defendants breached their fiduciary duties by advising them to engage in the investment strategies at issue and orchestrating their implementation, which generated "huge fees"; providing legal opinion letters that were not truly independent; and advising appellees to file tax returns in reliance on their advice. Appellees asserted that the Strategy Defendants knew, or should have known, that the IRS would likely consider the strategies at issue to be improper and illegal.

In their negligence claims, appellees alleged that the Strategy Defendants, during the course of their representation of appellees, omitted material facts, negligently made numerous affirmative representations that were incorrect, improper, or false, and gave improper recommendations, advice, and opinions. Appellees asserted that the Strategy Defendants knew, or should have known, that their representations, recommendations, advice, and opinions were inaccurate and improper. As a result of appellees' reliance on the Strategy Defendants' advice and recommendations, appellees paid millions of dollars to the Strategy Defendants in investments and fees.

In their fraud claims, appellees alleged 56 affirmative misrepresentations and intentional omissions of material fact by the Strategy Defendants. Appellees asserted that the enumerated misrepresentations were false when made, and the Strategy Defendants knew that they were false, but they made them with the intention that appellees rely on them in entering into the investment strategies. Further, appellees, in reasonable reliance on the Strategy Defendants' misrepresentations, paid substantial fees and amounts to execute the strategies and suffered injury.

In their conspiracy claim, appellees alleged that the Strategy Defendants and other participants acted in concert to design, market, sell, and implement the distressed-debt strategies, which they knew constituted fraudulent and illegal tax

11

shelters, by giving the false impression to appellees that they were legitimate business transactions. Further, the Strategy Defendants' conspiracy to commit fraud proximately caused appellees' damages.

Appellees brought, in the alternative, a breach-of-contract claim against the Strategy Defendants, alleging that they breached their agreement to provide professionally competent advice. Appellees further sought a judgment declaring that the parties' agreement and contracts were unenforceable. Appellees sought disgorgement of all payments rendered to the Strategy Defendants and rescission of the parties' agreements.

Gramercy, including Steamboat and Johnston, filed a combined special appearance, arguing that the Texas court lacked personal jurisdiction over them because they lacked sufficient contacts with Texas. In their amended special appearance, Gramercy asserted that appellees had "allege[d]—without any supporting concrete facts—three bases of jurisdiction." Namely, they alleged that Gramercy (1) had done and was doing business in the State of Texas, (2) had contracted with a corporation through their Texas offices, and either party was to perform the contract in whole or in part in Texas, and (3) had committed torts, in whole or in part, in Texas. Gramercy argued that it was BDO, and not Gramercy, who had advised appellees to engage in the investment strategies. As evidence,

Gramercy proffered the affidavits of Robert Lanava, Gramercy's Managing Director for Operations, and Johnston.[13]

Lanava testified that none of the Gramercy defendants, including Steamboat, is organized in Texas; rather, each has its principal place of business in either Connecticut or New York. In addition, the Gramercy defendants do not have offices or employees operating in Texas and do not have agency relationships or agreements with any co-defendant. Lanava asserted that the Gramercy defendants did not affirmatively solicit appellees' investments; rather, BDO referred appellees to Gramercy. Further, "[t]o the best of [his] knowledge," appellees visited New York to meet with Gramercy to discuss the proposed investments. Gramercy exchanged emails and facsimile communications with appellees incident to the administration of their investments and sent periodic written communications for signatures. The distressed debt and emerging market debt that appellees acquired was located in Brazil and in the Russian Federation. Gramercy procured currency options for appellees through firms located in New York City. Gramercy did not prepare, review, or file tax returns for appellees.

---

[13] Appellees filed objections and a motion to strike the affidavits of Lanava and Johnston on the grounds that the affidavits are conclusory and contain averments outside the affiants' personal knowledge. No ruling on these objections or motion appears in the record.

Johnston testified that he is a Co-Managing Member of Gramercy Advisors, LLC; lives in Puerto Rico, previously resided in Connecticut; and has never lived in Texas or had offices or property in Texas. Johnston testified that he did not affirmatively solicit appellees; rather, BDO referred appellees to Gramercy:

> [Appellees] invested in distressed Brazilian and certain Russian assets through Gramercy, and also separately invested in Gramercy's emerging market hedge funds. To the best of my recollection, I may have attended a single meeting in Texas in late 2000 with [appellees'] representatives and representatives of [BDO] prior to [appellees'] investments with Gramercy (I am not certain of the timing). To the best of my recollection, my participation was limited to a discussion of Gramercy's hedge fund operations; a description of emerging market distressed debt assets to be acquired by [appellees], and a general description of other financial and transactional aspects of the services that would be performed by Gramercy on [appellees'] behalf. I did not address the tax implications of any transactions conducted for [appellees], the anticipated IRS position with respect thereto, which I understand to be the subject of this action.
>
> Following [appellees'] investments with Gramercy, I met with [appellees] in Texas on a few additional occasions at [appellees'] request. However, the purpose of these meetings was solely to update [appellees] with respect to their investments in Gramercy's hedge funds. These investments were unrelated to the transactions subsequently challenged by the IRS which, as I understand it, form the basis of the instant lawsuit.

In their response to the special appearance, appellees disputed that Gramercy lacked sufficient minimum contacts with Texas. Specifically, they argued:

> Gramercy made numerous purposeful contacts with the state of Texas directly relating to the actions complained of by [appellees] in this case. Gramercy willfully participated in a scheme to defraud [appellees], all of whom are Texas residents. Gramercy met face-to-face with [appellees] in Texas on numerous occasions to market, sell, and

14

implement the tax-reducing investment strategies at issue in this case. Gramercy's role was much broader than merely executing investments strategies determined by others. Instead, Gramercy was actually involved from the beginning in every aspect of the tax-reducing investment strategies, including discussing the alleged tax benefits with [appellees] as part of the initial sales pitch in Texas. Contrary to Gramercy's position, Gramercy did, in fact, discuss the tax-advantaged nature of the strategies at Texas meetings and pitched the tax savings as one of the reasons for doing the deals. Those meetings alone subject Gramercy to jurisdiction in Texas. Gramercy also purposefully directed its activities at Texas by:

- Drafting, negotiating, and entering into numerous contracts with Texas-resident [appellees] related to the . . . investment strategies, which contracts contemplated a longterm relationship between the parties with performance occurring at least in part in Texas;

- Managing and holding partnership interests in several entities-some of which resided in Texas-that were involved in the tax-reducing investment strategies and selling partnership interests and distressed debt assets to Texas-resident [appellees];

- Directing and overseeing the preparation of tax returns . . . containing the tax losses generated by the . . . strategies for the benefit of Texas resident [appellees] and mailing and, in one instance, hand-delivering [them] to [appellees] in Texas;

- Earning millions of dollars from its purposeful actions in Texas through fees generated by investment management agreements with [appellees] and undisclosed kick-backs from consulting fees paid . . . to BDO;

- Sending regular, monthly account statements to [appellees] in Texas, setting up a secure website for [appellees] to view account information from Texas, and inviting [appellees] to participate in quarterly conference calls from Texas; and

- Marketing and selling tax-reducing investment strategies—similar to the ones sold to [appellees]—to other Texas clients.

As evidence in support, appellees proffered the affidavits of appellees Lowry,

Chabaud, and Moffitt, as well as that of their accountant, Vannaman, and attorney,

15

David Deary. Generally, in the affidavits, appellees averred that, at the September 26, 2000 meeting, BDO representatives presented the distressed-debt strategy and recommended that appellees engage Gramercy to assist BDO. At a follow-up meeting on November 7, 2000, Johnston introduced himself as a principal with Gramercy, and "Johnston and Shanbrom [with BDO] worked together equally on the 'pitch' that was made to [appellees] during the meeting." Both Shanbrom and Johnston touted Ruble at Sidley Austin as the recognized expert on distressed-debt strategies. Shanbrom explained that an opinion letter from Ruble would shield appellees from liability with the IRS. And, Johnston reiterated that Gramercy had experienced good results from Sidley Austin on these types of transactions in the past. In addition, Shanbrom represented, and Johnston confirmed, that investing with Gramercy in areas other than distressed debt would offer diversity and improve appellees' positions with the IRS. Both Johnston and Shanbrom assured appellees that the investment strategies were legal.

Appellees further averred that they met with Johnston and BDO representatives in Houston on January 11 and May 8, 2001, and on June 20, 2002, during which they discussed the opinion letters concerning the legality of the investment strategies and had broad discussions about each individual appellee's tax-loss needs for 2001 and 2002. On April 9, 2003, appellees met with Gramercy in Houston and signed interest transfer agreements. Appellees affidavits highlight

16

several other meetings with Gramercy principals in 2004 to discuss tax matters and investments.

Vannaman also testified in detail regarding appellees' meetings with BDO and Johnston, the distressed-debt strategies and transactions, the opinion letters, and the parties' agreements, correspondence, and tax filings.

At the special-appearance hearing and in a post-hearing letter to the trial court, appellees asserted that Steamboat's connection to the lawsuit is its participation in the 2003 Distressed-Debt Strategy. Specifically, Steamboat owned an interest in MPATRN, which contributed distressed debt to the LMC Fund. Nothing further was discussed, however, with respect to Steamboat's role in the transaction. After the hearing, the trial court denied the special appearance as to Gramercy Advisors, LLC Gramercy Asset Management, LLC, Gramercy Local Markets Recovery Fund, LLC, and Gramercy Financial Services, LLC[14] and postponed its ruling as to Johnston and Steamboat. Subsequently, the trial court denied the special appearances of Johnston and Steamboat.

**Personal Jurisdiction**

In appellants' second issue, Johnston contends that the trial court erred in denying his amended special appearance because he acted in a representative capacity, on behalf of other limited liability companies, and thus the fiduciary shield

---

[14]     *See Gramercy Advisors LLC*, 2015 WL 3981610, at *1.

17

doctrine protects him from the trial court's exercise of personal jurisdiction. Johnston asserts that, although appellees do not assert that he is subject to general jurisdiction, "this Court should apply the fiduciary shield doctrine to [a]ppellees' invocation of specific jurisdiction."

Steamboat contends that the trial court erred in denying its amended special appearance because appellees conceded that it is not subject to general jurisdiction, and appellees failed to present sufficient allegations or "any" evidence to support specific jurisdiction.

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Texas long-arm statute and the Fourteenth Amendment's due process clause and are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2015); *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C*., 815 S.W.2d 223, 226–27 (Tex. 1991).

The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. A nonresident "does business" in Texas if he, among other things, "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part" in Texas, or he "commits a tort in whole or in part" in Texas. *Id.* The Texas Supreme Court has repeatedly interpreted this

18

statutory language "to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal*, 815 S.W.2d at 226.

The United States Constitution permits a state to assert personal jurisdiction over a nonresident defendant only if (1) the defendant has some minimum, purposeful contacts with the state and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson-Austin v. Austin*, 968 S.W.2d 319, 326 (Tex. 1998).

A nonresident who has purposefully availed himself of the privileges and benefits of conducting business in the state has sufficient contacts with the state to confer personal jurisdiction. *Guardian Royal*, 815 S.W.2d at 226. Included in determining whether a defendant has purposefully availed itself of the privilege of conducting activities in Texas are three points:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must see some benefit, advantage or profit by availing itself of the jurisdiction.

*Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (internal citations and quotations omitted).

A defendant's contacts with a forum can give rise to either general or specific jurisdiction. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795–96

19

(Tex. 2002). General jurisdiction arises when a defendant's contacts are continuous and systematic, allowing the forum to exercise personal jurisdiction over the defendant, even if the cause of action did not arise from or relate to activities conducted within the forum state. *Id.* at 796. General jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction. *PHC Minden, L.P. v. Kimberly Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007).

When, as here, specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the defendant, the forum, and the litigation. *Moki Mac River Expeditions*, 221 S.W.3d at 575–76, 579 (purposeful availment alone will not support an exercise of specific jurisdiction). Specific jurisdiction arises when (1) the defendant purposefully avails itself of conducting activities in the forum state and (2) the cause of action arises from or is related to those contacts or activities. *Retamco Operating, Inc. v. Republic Drilling Co*., 278 S.W.3d 333, 338, 340 (Tex. 2009) ("[P]urposeful availment alone will not support an exercise of specific jurisdiction . . . ."). A cause of action arises from or relates to the forum contacts if there is a "substantial connection between [the] contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 579, 585. Thus, we consider the claims involved in the litigation to determine the operative facts. *Retamco Operating, Inc.*, 278 S.W.3d at 340.

20

Once a plaintiff establishes that a defendant has minimum contacts with Texas sufficient to support specific jurisdiction, we determine whether an assertion of jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." *Id.* at 341. We consider: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.* "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* (internal quotations omitted).

The existence of personal jurisdiction is a question of law, which must sometimes be preceded by the resolution of underlying factual disputes. *Marchand*, 83 S.W.3d at 794; *Paul Gillrie Inst., Inc. v. Universal Comput. Consulting, Ltd.*, 183 S.W.3d 755, 759 (Tex. App.—Houston [1st Dist.] 2005, no pet.). When the underlying facts are undisputed or otherwise established, we review a trial court's denial of a special appearance de novo. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002); *Paul Gillrie Inst.*, 183 S.W.3d at 759. When the appellate record contains the applicable trial record, these implied factual findings are not conclusive, and an appellant may challenge them for evidentiary

sufficiency.  *Marchand*, 83 S.W.3d at 794; *Waterman Steamship Corp. v. Ruiz*, 355 S.W.3d 387, 402 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).  When, as here, a trial court does not issue findings of fact or conclusions of law with its special appearance ruling, all fact findings necessary to support the judgment and supported by the evidence are implied.  *Marchand*, 83 S.W.3d at 795; *Paul Gillrie Inst.*, 183 S.W.3d at 759.

A trial court determines a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."  TEX. R. CIV. P. 120a(3); *see Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden.").

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute.  TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013); *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Moki Mac River Expeditions*, 221 S.W.3d at 574.  "[P]laintiffs must plead a connection between the defendants' alleged wrongdoing and the forum state."  *Kelly*, 301 S.W.3d at 655; *Waterman Steamship Corp.*, 355 S.W.3d at 403.

22

"In a tort case, the plaintiff must plead that the defendant committed a tortious act." *Waterman Steamship Corp.*, 355 S.W.3d at 403. If the plaintiff fails to plead sufficient facts to bring the defendant within the reach of the long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Kelly*, 301 S.W.3d at 658–59 (citing *Siskind v. Villa Found. for Educ., Inc*. 642 S.W.2d 434, 438 (Tex. 1982) ("[T]he only evidence offered to negate jurisdiction was [a defendant's] testimony that she and the other individuals were residents of Arizona . . . . In view of [the plaintiff's] failure to allege any act by these individuals in Texas, we believe that the [defendants] have sustained their burden.").

Once the plaintiff has pleaded sufficient jurisdictional allegations, the burden then shifts to the nonresident to negate all of the grounds for jurisdiction the plaintiff alleged. *Kelly*, 301 S.W.3d at 658 ("Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading."). The defendant can negate jurisdiction on either factual or legal grounds. *Waterman Steamship Corp.*, 355 S.W.3d at 404. To negate jurisdiction on factual grounds, the defendant can produce evidence showing that it has no contacts with Texas, which the plaintiff may, in turn, counter with its own evidence. *Id.* To negate jurisdiction on legal grounds, the defendant can establish that, even taking the alleged jurisdictional facts as true, its contacts with Texas "fall short of purposeful availment" or that "traditional notions

of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.* (internal quotations omitted). When specific jurisdiction is at issue, the defendant can also show that the plaintiff's claims do not arise from the defendant's contacts with Texas. *Wash. D.C. Party Shuttle, LLC v. IGuide Tours, LLC*, 406 S.W.3d 723, 728 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

When, as here, a case involves multiple defendants, the plaintiff must specify, and the court must examine, "each defendant's actions and contacts with the forum"; the defendants' contacts cannot be aggregated. *See Morris v. Kohls-York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd).

**A.** *Johnston*

In Johnston's sole argument on this issue, he asserts that he acted in a representative capacity, on behalf of other limited liability companies, and thus the fiduciary shield doctrine protects him from the trial court's exercise of personal jurisdiction. Johnston contends that, although appellees do not assert that he is subject to general jurisdiction, "this Court should apply the fiduciary shield doctrine to [a]ppellees' invocation of specific jurisdiction."

"Under the fiduciary shield doctrine, a nonresident officer or employee may not be subject to personal jurisdiction when all of his contacts with the forum state were made on behalf of his corporation or employer." *Yujie Ren v. ANU Res., LLC*, 502 S.W.3d 840, 849 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see Garner*

24

*v. Furmanite Austl. Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). "Texas courts applying the fiduciary shield doctrine have expressly limited its application to attempts to exercise general jurisdiction over a nonresident defendant because it is well-settled that a corporate agent can be held individually liable for fraudulent conduct." *Esse v. BP Am. Prod. Co*., No. 01-04-00567-CV, 2006 WL 1227724, at *8 (Tex. App.—Houston [1st Dist.] May 4, 2006, no pet.) (mem. op.); *see also Wellness Wireless, Inc. v. Vita*, No. 01-12-00500-CV, 2013 WL 978270, at *9 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mem. op.); *Golden Agri-Res. Ltd. v. Fulcrum Energy, LLC*, 01-11-00922-CV, 2012 WL 3776974, at *12 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem. op.); *TexVa, Inc. v. Boone*, 300 S.W.3d 879, 889 (Tex. App.—Dallas 2009, pet. denied); *Cerbone v. Farb*, 225 S.W.3d 764, 769 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Stern v. KEI Consultants, Ltd*., 123 S.W.3d 482, 488 (Tex. App.—San Antonio 2003, no pet.); *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied). The fiduciary shield doctrine does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable. *Golden Agri-Res. Ltd.*, 2012 WL 3776974, at *12; *SITQ E.U., Inc*., 111 S.W.3d at 651.

As a threshold matter, we note that Johnston did not raise the fiduciary shield doctrine in his special appearance, and he does not direct us to any other place in the

25

record in which he raised it in the trial court. *See Crithfield v. Boothe*, 343 S.W.3d 274, 287 (Tex. App.—Dallas 2011, no pet.) (noting fiduciary shield doctrine is a defense); *Esse*, 2006 WL 1227724, at *8 (same). As a prerequisite to presenting a complaint for appellate review, the record must show that "the complaint was made to the trial court by a timely request, objection, or motion . . . with sufficient specificity to make the trial court aware of the complaint," and that the trial court ruled on the complaint. TEX. R. APP. P. 33.1(a); *see Burbage v. Burbage*, 447 S.W.3d 249, 257 (Tex. 2014) (party seeking to preserve legal argument for review must apprise trial court of argument in manner that calls for trial court to decide that issue). Without a proper presentation of an alleged error to the trial court, a complaining party does not give the trial court any opportunity to correct the error. *Scott Bader, Inc. v. Sandstone Products, Inc.*, 248 S.W.3d 802, 817–18 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

Defensive arguments not presented to the trial court in pleadings, written motions, answers, or other responses cannot be considered on appeal as a ground for reversal. *See Dallas Cty. Cmty. Coll v. Bolton*, 185 S.W.3d 868, 876 n.6 (Tex. 2005) (holding issue of exemption from statutory restrictions not raised in trial court and not preserved for appeal); *Ltd. Logistics Servs., Inc. v. Villegas*, 268 S.W.3d 141, 150–51 (Tex. App.—Corpus Christi 2008, no pet.) (holding that corporate defendant appealing denial of special appearance waived defensive argument raised for first

26

time on appeal); *see also Parham Family Ltd. P'ship v. Morgan*, 434 S.W.3d 774, 787–88 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 354 (Tex. App.—Dallas 2004, pet. denied).

Further, the record of the hearing on Johnston's special appearance reflects that he affirmatively disavowed any application of the fiduciary-shield doctrine to this case:

> THE COURT: What about the case that they're citing that says the [fiduciary] shield doesn't apply.
>
> [Johnston]: *I don't think that this has anything to do with fiduciary shield at all. I'm addressing a much broader question. We didn't seek the application of fiduciary shield doctrine and it hasn't been briefed. They included this case*, but the larger issue is that Mr. Johnston would have to personally have come here and engaged in personal business to be personally liable. He didn't do that . . . .

(Emphasis added.)

Because Johnston does not direct us to any place in the appellate record in which he asserted in the trial court that the fiduciary shield doctrine applies, and the record shows that he affirmatively asserted in the trial court that he "didn't seek the application of fiduciary shield doctrine," "it hasn't been briefed," and this case does not "ha[ve] anything to do with fiduciary shield at all," we hold that Johnston has waived the issue for appellate review. *See Lombardo v. Bhattacharyya*, 437 S.W.3d 658, 666–67 (Tex. App.—Dallas 2014, pet. denied) (concluding that defendant did

not preserve for appellate review his issue asserting that trial court erred in concluding that it had specific jurisdiction over him because he was protected by fiduciary shield doctrine); *see also Kelly v. Cunningham*, 848 S.W.2d 370, 371 (Tex. App.—Houston [1st Dist.] 1993, no writ) (noting party may not lead trial court into error and then complain on appeal).

Even were we to conclude that Johnston raised a fiduciary-shield defense in the trial court, "Texas courts applying the fiduciary shield doctrine have expressly limited its application to attempts to exercise general jurisdiction over a nonresident defendant because it is well-settled that a corporate agent can be held individually liable for fraudulent conduct." *Esse*, 2006 WL 1227724, at *8. Here, appellees, in their brief, concede that they do not assert that Johnston is subject to general jurisdiction, and Johnston does not argue that the trial court found him subject to general jurisdiction. Rather, Johnston "urge[s] [this] Court to reconsider its position" that an application of the fiduciary-shield doctrine is limited to attempts to exercise general jurisdiction and urges that the Court "should apply the fiduciary shield doctrine to [a]ppellees' invocation of specific jurisdiction" over him. We decline to do so.

We overrule appellants' second issue.

**B.** *Steamboat*

Steamboat argues that it is not subject to the personal jurisdiction of the Texas court because appellees conceded that it is not subject to general jurisdiction, and appellees failed to present sufficient allegations or "any" evidence to support specific jurisdiction.

Because appellees concede in their brief that they alleged only specific, and not general, jurisdiction over Steamboat, we confine our analysis to whether Texas has specific jurisdiction over Steamboat. *See George v. Deardorff*, 360 S.W.3d 683, 688 (Tex. App.—Fort Worth 2012, no pet.) (focusing analysis on whether facts showed that trial court had specific jurisdiction because plaintiff specifically stated that she was "not alleging general jurisdiction applies here"). Again, specific jurisdiction arises when (1) the defendant purposefully avails itself of conducting activities in the forum state and (2) the cause of action arises from or is related to those contacts or activities. *Kelly*, 301 S.W.3d at 658. To support specific jurisdiction, there must be a "substantial connection" between the defendant's contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585.

1. *Jurisdictional allegations*

Steamboat asserts, as it did in its amended special appearance, that appellees' did not meet their initial burden to plead sufficient allegations in their petition to bring Steamboat within the provisions of the Texas long-arm statute. *See Moncrief*

*Oil Int'l Inc.*, 414 S.W.3d at 149; *Am. Type Culture Collection*, 83 S.W.3d at 807 (plaintiff bears initial burden to plead allegations sufficient to bring nonresident within provisions of Texas long-arm statute); *see also* TEX. R. CIV. P. 63 (amendment of deficient pleadings); *Kelly*, 301 S.W.3d at 658–59 ("If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction.").

"The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant who does business in Texas." *Perna v. Hogan*, 162 S.W.3d 648, 652 (Tex. App.—Houston [14th Dist.] 2005, no pet). The statute provides, as relevant here, that a nonresident does business in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or "commits a tort in whole or part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1)-(2).

In *Brenham Oil & Gas, Inc.*, this Court held that an allegation that at "all times material to this lawsuit, [defendant] was doing business in Houston, Harris County, Texas," was sufficient to carry the plaintiff's initial burden to plead jurisdictional facts and shifted the burden to the defendant to negate all the bases of jurisdiction alleged. 472 S.W.3d at 763.

Similarly, in *Huynh v. Nguyen*, the Fourteenth Court of Appeals held that the plaintiff satisfied its initial burden by pleading that the defendant had "conducted business in Texas and committed torts in Texas." 180 S.W.3d 608, 619–20 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The court noted that "[t]here is no requirement that plaintiffs or other claimants plead in their petition the theories or bases of personal jurisdiction upon which they rely; rather, the only relevant pleading requirement flows from the need to plead allegations sufficient to bring nonresident defendants within the provisions of the long-arm statute." *Id.* at 619 (citing *Am. Type Culture Collection*, 83 S.W.3d at 807 (stating plaintiffs bear initial burden of pleading allegations sufficient to bring nonresident defendants within provisions of long-arm statute)). "This minimal pleading requirement is satisfied by an allegation that the nonresident defendants are doing business in, or have committed any act in, Texas." *Id.*; *see also Info. Servs. Group Inc. v. Rawlinson*, 302 S.W.3d 392, 399 n.4 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (holding that, liberally construing the pleadings, as required, the plaintiffs satisfied their initial pleading burden by alleging that the defendant had "entered into contracts with Texas companies calling for performance in part in Texas," had "breached his agreements with the appellants," had "engaged in significant activities in or related to Texas," and had "conducted business and negotiated in Texas with Texas residents").

Further, in *CMC Steel Fabricators, Inc. v. Red Bay Constructors, Inc.*, the plaintiff's allegations that "all or a substantial part of the acts or events or obligations of the parties were to be performed in Harris County, Texas," and that the parties "contractually agreed that all obligations under its course of dealing with [the defendant] were to be performed in Harris County, Texas" were sufficient to bring the defendant within the reach of the Texas long-arm statute. No. 14-13-00084-CV, 2014 WL 953351, at *3 (Tex. App.—Houston [14th Dist.] Mar. 11, 2014, no pet.) (mem. op.).

Here, appellees, in their fifth amended petition, alleged that Steamboat is a limited liability company, organized and existing under the laws of the State of Delaware, with its principal place of business is in Greenwich, Connecticut. Appellees alleged that, "[a]ll relevant times, [Steamboat] has done and is doing business in the State of Texas, but does not maintain a regular place of business or current designated agent." Steamboat "has contracted with a corporation through its Texas office, and either party was to perform the contract in whole or in part in the State of Texas." Further, Steamboat "has committed intentional torts, in whole or in part, in the State of Texas," and Steamboat directed those torts toward a Texas resident and caused harm in Texas.

As Steamboat itself asserted in its amended special appearance, "[appellees] allege[d] . . . three bases of jurisdiction over [Steamboat]: (1) that it 'has done and is

doing business in the State of Texas'; (2) that it 'contracted with a corporation through its Texas office, and either party was to perform the contract in whole or in part in the State of Texas'; and (3) that it 'has committed torts, in whole or in part, in the State of Texas.'" These allegations are sufficient to carry appellees' initial burden to plead allegations sufficient to bring Steamboat within the reach of the Texas long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (acts that may constitute "doing business" include "contract[ing] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or "committing a tort in whole or part in this state"); *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 763 (holding that allegation that at "all times material to this lawsuit, [defendant] was doing business in Houston, Harris County, Texas," was sufficient to carry plaintiff's initial burden to plead jurisdictional facts and shifted burden to defendant); *Huynh*, 180 S.W.3d at 619–20 (stating plaintiff's minimal pleading requirement was satisfied by allegation that nonresident defendants were doing business in Texas); *cf. George*, 360 S.W.3d at 688–89 (plaintiff did not meet initial burden to allege facts sufficient to confer jurisdiction where she neither alleged that defendants had done business in Texas, nor alleged any other jurisdictional facts).

Thus, the burden shifted to Steamboat to negate each of appellees' alleged bases of jurisdiction. *See Kelly*, 301 S.W.3d at 658; *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 763.

33

2. *Jurisdictional evidence*

As its evidence to challenge appellees' jurisdictional allegations, Steamboat attached to its special appearance the affidavit of Lanava, who testified, as an authorized representative of Steamboat, that Steamboat is a Delaware limited liability company with its principal and sole place of business in Greenwich, Connecticut. Lanava testified that Steamboat does not have offices in the Texas; has never owned, leased, or held any real property or other assets in Texas; has never maintained bank accounts in Texas; has never had any members domiciled or residing in Texas; has never had any employees or representatives in Texas; does not have employees who are professionally licensed in Texas; has never maintained any telephone lines or listings in Texas; does not transact business in Texas; has never been licensed or registered to do business in Texas; has never filed sales or income tax returns in Texas; and has never solicited Texas residents or advertised in Texas, or anywhere else in a manner specifically calculated to attract Texas investors. Lanava further testified that Steamboat did not affirmatively solicit appellees' investments and did not prepare, review, or file tax returns for appellees.

"Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly*, 301 S.W.3d at 658; *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 764. Here, because appellees, in their petition, generally complained of

alleged misconduct by the "Strategy Defendants," collectively, and did not present any specific facts linking Steamboat to Texas, Steamboat's evidence, generally denying that it does business in Texas and denying that it committed a tort in Texas, is sufficient to negate appellees' jurisdictional allegations in their petition. *See Moncrief Oil Int'l Inc.*, 414 S.W.3d at 149–50 (holding that because plaintiff's "sole allegation as to personal jurisdiction" was that defendants "committed torts in Texas," defendants "must negate that basis"); *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 764 (holding that because plaintiff's "petition was devoid of specific Texas-linked factual allegations," defendant adequately negated jurisdictional allegations by denying particular associations with Texas).[15]

Thus, the burden returned to appellees to respond with their own evidence affirming their allegations. *See Kelly*, 301 S.W.3d at 659; *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 764.

As their evidence in support of their jurisdictional allegations,[16] appellees attached to their response to the special appearance the affidavits of appellees

---

[15]    Although Steamboat also presented evidence that it was not formed until January 31, 2002, long after the year 2000 meetings at which appellees allege that they were first induced to enter into the tax-shelter transactions at issue, appellees' allegations also involve, as discussed above, conduct occurring in tax years 2002 through 2005.

[16]    Appellees also asserted that Johnston's and Steamboat's special appearances are defective because they are not verified, as required. *See* TEX. R. CIV. P. 120a. We addressed a similar complaint by appellees in one of this Court's prior opinions in this case. *See Fin. Strategy Grp., PLC v. R.K. Lowry, Jr.*, 2015 WL 452265, at *9. There, we held that although Financial Strategy's special appearance was not

Lowry, Chabaud, and Moffitt, as well as that of their accountant, Vannaman, and attorney, Deary. Notably, these affidavits do not mention Steamboat individually. Instead, the affidavits generally averred that, at the September 26, 2000 meeting that took place in Houston, BDO representatives presented the distressed-debt strategy and recommended that appellees engage Gramercy to assist BDO. At a follow-up meeting on November 7, 2000, which was also in Houston, Johnston introduced himself as a principal with Gramercy, and "Johnston and Shanbrom [with BDO] worked together equally on the 'pitch' that was made to [appellees] during the meeting." Both Shanbrom and Johnston touted Ruble at Sidley Austin as the recognized expert on distressed-debt strategies. Shanbrom explained that an opinion letter from Ruble would shield appellees from liability with the IRS. And, Johnston reiterated that Gramercy had experienced good results from Sidley Austin on these types of transactions in the past. In addition, Shanbrom represented, and Johnston confirmed, that investing with Gramercy in areas other than distressed debt would

---

verified, the attached affidavit sufficed to verify the special appearance. *See id.* Here, we similarly hold that Johnston's and Lanava's affidavits, which likewise contain verifications of the same jurisdictional facts stated in the special appearance, sufficed to verify Johnston's and Steamboat's special appearances. *See id.*; *see also* TEX. R. CIV. P. 63 (amendment of deficient pleadings); *cf. Wash. D.C. Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 730–31 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (holding affidavit in support of special appearance that did not expressly verify facts in special appearance was sufficient because affidavit contained same jurisdictional facts as special appearance).

36

offer diversity and improve appellees' positions with the IRS. Both Johnston and Shanbrom assured appellees that the investment strategies were legal.

Appellees further averred that they met with Johnston and BDO representatives in Houston on January 11 and May 8, 2001, and on June 20, 2002, during which they discussed the opinion letters concerning the legality of the investment strategies and had broad discussions about each individual appellee's tax-loss needs for 2001 and 2002. On April 9, 2003, appellees met with Gramercy in Houston and signed interest transfer agreements. Appellees affidavits highlight several other meetings with Gramercy principals in 2004 to discuss tax matters and investments.

Vannaman testified in detail, throughout his 22-page affidavit, regarding the appellees' meetings with BDO and Johnston, the distressed-debt strategies and transactions, the opinion letters, and the parties' agreements, correspondence, and tax filings.

Nowhere do any of these affiants identify any representation, omission, act, agreement, or breach specifically *by Steamboat*. Rather, appellees generally complain of collective misconduct by "Gramercy" or the "Strategy Defendants." When, as here, there are multiple defendants, each defendant's actions and contacts with the forum must be tested separately. *See Morris*, 164 S.W.3d at 693; *see also Brenham Oil & Gas, Inc*., 472 S.W.3d at 765 (concluding that plaintiff failed to offer

evidence of particular tortious acts or communications by defendant) (citing *Siskind*, 642 S.W.2d at 437 (holding that court lacked specific jurisdiction over foreign defendants when "no specific acts of conspiracy or misrepresentations" were attributed to them)).

Appellees, in their appellate brief, argue that they submitted evidence that "Steamboat participated with the Gramercy Co-Defendants in implementing one of the Investment Strategies," namely, the 2003 Distressed-Debt Strategy, "sold to Texas-resident Appellees." The record shows that at the special-appearance hearing and in a post-hearing letter to the trial court, appellees' counsel argued that "the connection of Steamboat to the transaction was its participation" in the 2003 Distressed-Debt Strategy by owning an interest in MPATRN, a Delaware entity that contributed distressed debt to the LMC Fund. No further discussion took place, and no evidence was presented regarding Steamship's ownership interest in MPATRN. A trial court may determine a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." *See* TEX. R. CIV. P. 120a(3). However, counsel's "[u]nsupported argument is not evidence." *Grant Prideco, Inc. v. Empeiria Conner L.L.C.*, 463 S.W.3d 157, 162 n.10 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Green v. Brantley*, 11 S.W.3d 259, 264 (Tex. App.—Fort Worth 1999, pet. denied).

Moreover, even if the evidence showed that Steamboat owned an interest in MPATRN, "a defendant can only trigger specific jurisdiction through its own conduct, not the unilateral acts of third parties." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596 (Tex. 2007); *see Predator Downhole Inc. v. Flotek Indus., Inc.*, 504 S.W.3d 394, 403 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Fin. Strategy Grp., PLC*, 2015 WL 452265, at *11 (concluding that "the bare fact that a defendant receives some benefit, advantage, or profit from Texas does not necessarily mean that it has purposefully availed itself of the State" and holding that contacts were "too attenuated").

Appellees further argue that they submitted evidence that Steamboat purposefully availed itself of a Texas forum by filing a related lawsuit. The record shows that appellees sent to the trial court a letter and a copy of a petition filed by various Gramercy entities and Steamboat against a law firm that represented them during the events at issue in the instant case. The petition was filed in a Texas court on December 19, 2014, six years after the instant 2008 suit was filed. *See Gramercy Advisors LLC, et al. v. Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.*, Cause No. DC-14-14763 (162nd Dist. Ct., Dallas Cty., Tex.) (the "Chamberlain Lawsuit"). In the letter to the trial court, appellees alleged that the "same distressed-debt-tax-shelter transactions are at the heart of both this lawsuit and the Chamberlain lawsuit." Specifically, the Gramercy entities and Steamboat sued

39

Chamberlain for allegedly failing to disclose a conflict of interest stemming from Chamberlain's alleged concurrent representation of the Gramercy entities, Steamboat, and certain tax shelter investors, including some of the appellees in this case, in connection with IRS audits and for allegedly using privileged information to counsel the investors to sue the Gramercy entities and Steamboat.

Arguing that "[v]oluntarily filing a lawsuit in a jurisdiction is a purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit when the lawsuits arise from the same general transaction," appellees relied on *In re Davis*, 216 S.W.3d 537, 546 (Tex. App.—Texarkana 2007, pet. denied); *Zamarron v. Shinko Wire Co.*, 125 S.W.3d 132, 143 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); and *Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin*, 974 S.W.2d 918, 926 (Tex. App.—El Paso 1998, no pet.).

In each of these cases, however, the issue presented was whether the defendant's filing of a *prior* lawsuit constituted purposeful availment of the forum in a *subsequent* lawsuit. *See Zamarron*, 125 S.W.3d at 143 (holding defendant not subject to specific jurisdiction based on *prior* cross-actions filed in two unrelated lawsuits); *Primera Vista*, 974 S.W.2d at 925–26 (holding defendant not subject to *general* jurisdiction based on *prior* lawsuit filed in Texas state court). In *Davis*, on which appellees again rely on appeal, a defendant who petitioned a Texas court to

be recognized as executor was held to have "invoked the authority of the Texas court" and was subject to specific jurisdiction in a *later* suit brought against him by the heirs, based on his previous suit and conduct as executor. 216 S.W.3d at 546.

Although appellees asserted in their letter to the trial court, as they do on appeal, that the Chamberlain lawsuit "is relevant to jurisdiction even though it post-dates the filing of this lawsuit," they do not cite any Texas authority in support.[17]

Further, appellees did not argue in the trial court that Steamboat waived its special appearance in the instant suit by filing a subsequent lawsuit. Rather, appellees asserted that the Chamberlain lawsuit is simply "relevant to jurisdiction," constituted a "purposeful availment," and "in any event, the Court can take this information into account to rebut Steamboat's argument that the exercise of this Court's jurisdiction over it would offend traditional notions of fair play and substantial justice."

---

[17] We note that it is well-established that, in determining whether a nonresident defendant has continuous and systematic contacts with Texas sufficient to support *general* jurisdiction, the court examines the defendant's contacts and forum-related activities up to the time suit was filed. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 169–70 (Tex. 2007); *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807–08 (Tex. 2002) (conducting general-jurisdiction analysis by examining contacts with Texas up until the commencement of the suit); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same); *see also* 4 Wright & Miller, Federal Practice & Procedure § 1067.5 (noting that "a court should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit").

Even were we to conclude that filing a subsequent lawsuit, in this case six years after the suit at issue was filed, constitutes purposeful availment, "[p]urposeful availment alone will not support an exercise of specific jurisdiction." *See Moki Mac*, 221 S.W.3d at 579. Again, for the trial court to properly assert specific personal jurisdiction over Steamboat, Steamboat must have "purposefully directed" its activities at the forum, and the litigation must result from alleged injuries that "arise out of or relate to" the defendant's activities directed at the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182 (1985); *see also Retamco Operating, Inc.*, 278 S.W.3d at 338. Foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 227. "[T]he concept of foreseeability is implicit in the requirement that there be a substantial connection between the nonresident defendant and Texas *arising from* action or conduct of the nonresident defendant purposefully directed toward Texas." *Id.* (emphasis added) (internal quotations omitted).

We conclude that Steamboat has negated all bases for an assertion of specific jurisdiction over it. *See Siskind*, 642 S.W.2d at 437 (holding that court lacked specific jurisdiction over foreign defendants when "no specific acts of conspiracy or misrepresentations" were attributed to them); *Brenham Oil & Gas, Inc.*, 472 S.W.3d at 764–65 (concluding that plaintiff failed to offer evidence of particular tortious acts

42

or communications by defendant). Because appellees have not demonstrated that Steamboat has sufficient minimum contacts with Texas to subject it to personal jurisdiction, we hold that the trial court erred in denying its special appearance.

We sustain appellants' first issue.

## Conclusion

We affirm the trial court's order denying Johnston's special appearance. We reverse the trial court's order denying Steamboat's special appearance and render judgment granting the special appearance and dismissing the claims against Steamboat.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Keyes and Caughey.